**SMB PARTNERS, LTD., Appellant,**

v.

**Hassan OSLOUB, Appellee.**

**No. 01–98–00926–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Sept. 30, 1999.

William T. Green, III, Houston, for Appellant.

Charles Wilson, Jr., Houston, for Appellee.

Panel consists of Justices O'CONNOR, WILSON, and ANDELL.

## OPINION

DAVIE L. WILSON, Justice.

Appellant SMB Partners, Ltd., the defendant below, appeals a judgment in favor of appellee Hassan Osloub, the plaintiff in the nonjury trial below. We affirm.

### PROCEDURAL AND HISTORICAL BACKGROUND

Osloub sued five defendants: SMB, Texas American Title Company ("TATCO"), Apollo Hicks, Inc., Herbert L. Hicks, Jr., and Stewart Title Guaranty Company.[1] In addition to actual damages, the trial court awarded Osloub exemplary damages from SMB based on SMB's commission of statutory fraud with actual awareness. SMB appeals from that portion of the judgment awarding exemplary damages and attorney's fees.

---

1. TATCO settled with Osloub. The trial court rendered a take-nothing summary judgment in favor of Stewart Title and severed Osloub's claim against Stewart Title from this cause. The trial court awarded Osloub $7,600 in actual damages, jointly and severally against Apollo, Hicks, and SMB. Under the "one satisfaction rule," Apollo, Hicks, and SMB received sufficient credit from TATCO's settlement to satisfy their liability for actual damages.

Osloub's cause of action arose from a real estate transaction between Osloub and SMB. In spring 1993, Osloub and John C. LaFave, Osloub's attorney, met with Randall Joe Mayer, one of SMB's limited partners, to discuss Osloub's interest in buying real property owned by SMB and located at the intersection of Mykawa Road and Donoho Avenue. Osloub testified that, at one of the meetings, Mayer explained that Southwestern Bell owned a 40 foot easement along Donoho Avenue. LaFave testified Mayer also indicated that Bell was interested in buying another easement to construct a small "Box," and Bell would contact Osloub. Mayer explained to Osloub that an easement meant that Osloub would not be able to build anything on that part of the property, but that both the owner of the property and owner of the easement would have access to it. Osloub indicated he would be willing to sell Bell an easement so long as Bell's proposed use would not interfere with his use of the property.

On May 17, 1993, LaFave sent Mayer a letter presenting Osloub's offer to buy the property. SMB subsequently sold an easement to Bell granting Bell the right to pave and fence a 2,588 square foot area. The easement covered an irregular four-sided tract of land extending approximately 60 to 69 feet into the property from the Donoho Avenue. Bell intended to construct, not a small "box," but a building to house telecommunications facilities.

After SMB sold the easement to Bell, SMB and Osloub executed an earnest money contract in which Osloub agreed to buy the property from SMB. The contract provided in relevant part:

Purchaser has not entered into this Agreement based upon any representation, warranty, agreement, statement or expression of opinion by Seller or by any person or entity acting or allegedly acting for or on behalf of Seller as to the Property or the condition of the Property. Purchaser agrees that the Property is to be sold to and accepted by Purchaser at Closing, in its then present condition, AS IS, WHERE IS, WITH ALL FAULTS, IF ANY, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, other than the warranty of title to be included in the Deed.... [I]t being understood and agreed that except for the warranty of title contained in the Deed; Seller makes no representations or warranties of any kind or nature in connection with this Agreement. Further, Purchaser represents and warrants to Seller that Purchaser has knowledge and expertise in financial and business matters that enable Purchaser to evaluate the merits and risks of the transaction contemplated by this Agreement and that Purchaser is not in a significantly disparate bargaining position.

The terms of the earnest money contract required SMB to provide a survey of the property, and the survey was to "[f]ix ... any easements or building lines thereupon." The contract also designated that TATCO furnish a "title insurance commitment." Osloub had three days after delivery of the survey in which he could exercise his right to examine the survey and notify SMB of any material differences between the survey and the title commitment. If SMB did not cure the objections to title before closing, Olsoub could terminate the agreement.

William Green represented SMB, and either he or Mayer drafted the earnest money contract. Green was a "fee attorney" with TATCO and had an on-going relationship with TATCO.

On July 12, 1993, Stewart Title issued a title policy commitment that contained, as characterized by the trial court, a "misleading" description of the easement. It described an easement "forty (40) feet in width along the southerly property line." Based on this description, Herbert Hicks, a surveyor hired by SMB, prepared a survey plat that contained an inaccurate drawing of the easement. Instead of

showing a portion of land 40 feet wide jutting 60 to 69 feet into the property from the south, it showed a strip of land extending 40 feet into the property and running along the entire southern boundary of the property.

At the July 23, 1993 closing, Osloub and LaFave saw the inaccurate survey plat prepared by Hicks. LaFave testified he would have advised Osloub not to proceed with the closing had he seen an accurate survey map. SMB and Osloub executed the deed, note, and deed of trust, which were all prepared by Green.

On July 27, 1993, Hicks prepared and delivered to SMB a corrected survey plat that accurately reflected the size, shape, and location of the easement. The following day, SMB delivered three copies of the corrected survey to TATCO. TATCO did not make the corrected plat available to Osloub until August 19, 1993, the day after TATCO had delivered Osloub's money and note to SMB. Osloub testified that he first became aware of the nature of Bell's easement sometime in 1996 when Bell came onto the property and began to survey it.

### LEGAL EFFECT OF THE "AS IS" CLAUSE

■ Reliance is a necessary element of both common-law and statutory fraud. *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 182 (Tex.1997). In issue one, SMB contends that, as a matter of law, the "as is" clause in the earnest money contract precludes Osloub from relying on any oral representations made by SMB.[2]

■ "[A] release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." *Schlumberger,* 959 S.W.2d at 181 (Tex.1997). Such a release may also preclude a claim of fraudulent nondisclosure. *See id.* An "as is" clause, however, is not determinative in every circumstance. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 162 (Tex.1995). An agreement to purchase something "as is" does not bind a buyer when a fraudulent representation or concealment of information induced the purchase. *Id.*

■ Moreover, the purported misrepresentation at issue in the present case was in a document (the plat survey) that related to the status of the title. Language in the earnest money contract specifically excluded representations in the warranty of title from the effect of the "as is" clause: "As is," ... without any representations or warranties *other than the warranty of title to be included in the Deed.... [E]xcept for the warranty of title* contained in the Deed; Seller makes no representations or warranties" (upper case deleted; emphasis added). An easement may constitute a burden on title. *See Southern Pac. Co. v. Hayes,* 391 S.W.2d 463, 467 (Tex. Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.) (referring to "fee title" as burdened by street easement).

■ We construe the contract strictly against the party that drafted it. *Temple–Eastex, Inc. v. Addison Bank,* 672 S.W.2d 793, 798 (Tex.1984); *see Universal Sav. Ass'n v. Killeen Sav. & Loan Ass'n,* 757 S.W.2d 72, 76 (Tex.App.—Houston [1st Dist.] 1988, no writ). We conclude that the "as is" clause does not apply to the purported misrepresentation here. The

2. In support of its contention SMB relies on three cases. *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171 (Tex.1997); *C & A Invs., Inc. v. Bonnet Resources Corp.,* 959 S.W.2d 258 (Tex.App.—Dallas, 1997, writ den'd); *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289 (Tex.App.—El Paso 1992, writ den'd). *Schlumberger* involved a disclaimer of reliance clause in a negotiated release of rights and interests in a diamond mining project. *C & A Investments* involved a loan sale agreement. *Airborne Freight* involved language in a contract for delivery services. None of the cases involved a real estate transaction in which the alleged misrepresentation related to the status of the title.

clause does not, as a matter of law, preclude Osloub's reliance on SMB's representations about the Bell easement.

We overrule issue one.

## FACTUAL SUFFICIENCY
## OF THE EVIDENCE

In issue two, appellant contends the evidence was factually insufficient to support the award of exemplary damages. The trial court stated in its conclusions of law that SMB committed fraud against Osloub when it "represented" to Osloub:

> that Southwestern Bell had not yet purchased the Easement, that Southwestern Bell would want to purchase the Easement from Plaintiff, after closing, and that Southwestern Bell only wanted to purchase the right to construct a small "2' × 4' Box" on the 7.6519 acres before [Osloub] signed the Earnest Money Contract.

The trial court also concluded that SMB had committed "a second act of fraud" against Osloub "when, during the period from July 23, 1993 to August 18, 1993, it failed to disclose to [Osloub] that the survey plat shown to him on July 23, 1993 misrepresented the size, shape and location of the Easement." Finally, the court concluded that "[e]ach act of fraud committed by SMB against [Osloub] can support a separate award of exemplary damages."

Section 27.01 of the Business and Commerce Code provides in relevant part:

> (a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
>
> (1) false representation of a past or existing material fact, when the false representation is
>
> (A) made to a person for the purpose of inducing that person to enter into a contract; and
>
> (B) relied on by that person in entering into that contract;
>
> . . . .
>
> (c) A person who makes a false representation or false promise with actual

awareness of the falsity thereof commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

> (d) A person who (1) has actual awareness of the falsity of a representation or promise made by another person and (2) fails to disclose the falsity of the representation or promise to the person defrauded, and (3) benefits from the false representation or promise commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

TEX. BUS. & COM.CODE ANN. § 27.01 (Vernon 1987).

■ The Civil Practices and Remedies Code requires that a person seeking recovery of exemplary damages resulting from fraud must establish the elements of fraud "by clear and convincing evidence." TEX. CIV. PRAC. & REM.CODE ANN. § 41.003 (Vernon 1997). When a party must have proved its allegations by clear and convincing evidence, this Court "will set aside the judgment only if the evidence is so weak or the finding so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *In re J.N.R.*, 982 S.W.2d 137, 143 (Tex.App.—Houston [1st Dist.] 1998, no pet.); *Hollander v. Capon*, 853 S.W.2d 723, 726 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

■ SMB appears to contest the factual sufficiency of the evidence on the elements of Osloub's reliance on the false representation and SMB's actual awareness of the false representation. In support of its claim that the evidence was factually insufficient, SMB points to the following:

1. Olsoub's not having placed into evidence the map depicting the Bell easement that Osloub said Mayer

showed him before execution of the contract;

2. Lack of testimony that Osloub relied on anything Mayer told him;

3. Osloub's testimony that he did not talk to Mayer about the July 20, 1993 survey that Osloub stated he saw at the July 23, 1993 closing;

4. Hicks' testimony that his mistake in drafting the survey was due to his interpretation of the title commitment and that he corrected the mistake when TATCO sent him a copy of the actual easement;

5. Testimony that Hicks never met or talked with anyone at SMB and that no one at SMB told him to draw the Bell easement in any way; and

6. Osloub's testimony that TATCO received the corrected survey before the final disbursement, but neglected to send it to Osloub until after the disbursement.[3]

The "false representation" consisted of the inaccurate survey map. Osloub retained LaFave to represent him in the purchase of the property. LaFave saw the inaccurate plat at closing and testified he would have advised against the purchase had he seen an accurate map. When initially told about Bell's interest in buying an easement, Osloub was concerned with whether the easement would interfere with his use of the property. The easement SMB sold Bell granted Bell the right to fence the easement. We conclude that the evidence of Osloub's reliance on the inaccurate survey plat was factually sufficient.

We also conclude that the evidence was factually sufficient to support SMB's actual awareness of the false representation. By the terms of the earnest money contract, SMB was responsible for providing a survey of the property that would fix any easements.[4] Green is SMB's attorney. He also was a fee attorney for, and had an ongoing relation with, TATCO. He prepared papers for the closing and received forty percent of the title insurance policy premium. Even though SMB delivered three copies of the corrected plat survey to TATCO on July 28, 1993, TATCO did not provide Osloub the corrected plat survey until August 19, after TATCO had delivered Osloub's money and note to SMB. The relationships among the actors and the timing of the ultimate disclosure of the corrected plan survey support the inference that SMB had actual awareness of the false representation.

The trial court's findings were not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *J.N.R.*, 982 S.W.2d at 143. We overrule issue two.

## ATTORNEY'S FEES

In issue three, SMB contends that Osloub should not be allowed to recover attorney's fees because Osloub had no admissible evidence at trial to support attorney's fees. SMB bases its argument on Osloub's not having identified Charles Wilson as an expert witness in response to Stewart Title's written interrogatories before Osloub's claim against Stewart Title was severed. When Wilson informed the court that he would be testifying about attorney's fees, SMB objected on the ground that Wilson had not been identified. The court overruled the objection, and the parties stipulated

---

3. In its argument in support of issue one, SMB faults Osloub and his attorney for not having taken the time to review the actual recorded Bell easement, which SMB contends would have revealed the actual locations and rights SMB granted to Bell. We find no binding Texas case holding that a purchaser's failure to search the deed records would bar his fraud action against the seller. *See Ojeda de Toca v. Wise*, 748 S.W.2d 449, 450–51 (Tex.1988); *Millhouse v. Wiesenthal*, 757 S.W.2d 103, 107 (Tex.App.—Houston [1st Dist.] 1988), *aff'd on other grounds*, 775 S.W.2d 626 (Tex.1989).

4. SMB was to provide the survey with the title commitment. The title commitment issued July 12, 1993, but the survey plat is dated July 20, 1993.

to the amount, but not to whether Osloub should recover attorney's fees.

■ Osloub answered Stewart Title's interrogatories on April 24, 1997, and stated that he had not, at that time, determined whom he would use as experts. By the June, 1998 trial the court had severed Stewart Title from the suit. Osloub was not required to supplement his answers to Stewart Title. *Austin Ranch Enters., Inc. v. Wells,* 760 S.W.2d 703, 710 (Tex.App.—Fort Worth 1988, writ denied).

We overrule issue three.

### CONCLUSION

We affirm the judgment.